George **HADGES**, Plaintiff–Appellant,

William M. Kunstler, Appellant,

v.

**YONKERS RACING CORP.**,
Defendant–Appellee.

No. 619, Docket 94–7444.

United States Court of Appeals,
Second Circuit.

Argued Nov. 9, 1994.

Decided March 2, 1995.

William M. Kunstler, New York City, for plaintiff-appellant and for himself, pro se.

Frederick J. Martin, White Plains, NY (Bleakley Platt & Schmidt, William P. Harrington, of counsel), for defendant-appellee.

Before: FEINBERG, KEARSE and ALTIMARI, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff George Hadges appeals from three rulings of the United States District Court for the Southern District of New York, Gerard L. Goettel, J. The first ruling, filed in March 1994 and reported at 845 F.Supp. 1037 (S.D.N.Y.1994), denied relief to Hadges in his action brought under Fed.R.Civ.P. 60(b) (the Rule 60(b) action) to set aside the judgment of the court in an earlier case, *Hadges v. Yonkers Raceway Corp.*, 733 F.Supp. 686 (S.D.N.Y.1990) (*Hadges I*). In *Hadges I*, Judge Goettel had denied Hadges's application for a preliminary injunction and had granted defendant Yonkers Racing Corp. (YRC) summary judgment in Hadges's action against it. We affirmed that judgment in an opinion reported at 918 F.2d 1079 (2d Cir.1990), cert. denied, 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991). The basis of the present Rule 60(b) action is that YRC had committed a fraud on the court in *Hadges I*.

In the second ruling on appeal, issued on April 14, 1994, Judge Goettel imposed Rule 11 sanctions on Hadges and his attorney, William M. Kunstler, for misleading the court in the course of the Rule 60(b) action. The judge fined Hadges and censured Kunstler. In the third ruling, two weeks later, the judge denied Hadges and Kunstler permission to reargue the sanctions issues. This appeal followed. For the reasons stated below, we affirm the denial of Rule 60(b) relief, but we reverse the sanction on Hadges and the censure of Kunstler.

## I. Background

This appeal concerns the most recent dispute arising out of the efforts of plaintiff-appellant Hadges to compel various racetracks and state agencies to permit him to pursue his career as a harness racehorse driver, trainer and owner. We set forth below the factual background; first, as it relates to denial of Rule 60(b) relief to plaintiff, and second, as it relates to the sanctions imposed upon plaintiff and his attorney.

### A. Facts underlying Rule 60(b) action

Hadges was first licensed by the New York State Racing and Wagering Board

(Racing Board) in 1972. His license was suspended and revoked in 1974 because he failed to disclose the full extent of his criminal arrest record in his initial license application. Hadges was relicensed in 1976.

In early 1989, the Racing Board again suspended Hadges's license for six months after determining that Hadges had illegally passed wagering information to a member of the betting public at Roosevelt Raceway in 1986. According to the Racing Board, as Hadges approached the starting gate, he trailed behind the other horses and shouted, "Get the '7'," to someone in the stands. The number seven horse did in fact win, and Hadges's horse, number two, drove erratically and interfered with the other horses.

In September 1989, although the Racing Board had reissued Hadges's license, YRC denied Hadges the right to work at its racetrack, Yonkers Raceway. In response, Hadges filed an action against YRC in the district court under 42 U.S.C. § 1983, which resulted in the decision in *Hadges I*. Hadges alleged that YRC had violated his Fourteenth Amendment right to due process in banning him. In the course of the *Hadges I* litigation, YRC submitted an affidavit of its General Manager, Robert Galterio, who stated that the YRC ban did not prevent Hadges from pursuing his profession because he could still work at other regional tracks, including the Meadowlands in New Jersey.

In March 1990, the district court granted YRC's motion for summary judgment, finding that YRC's practices were not state action and thus could not give rise to liability under § 1983. In two footnotes, the district court indicated its apparent understanding that Hadges was not barred from racing at other facilities but "that proof that other tracks in the state followed YRC's decision could establish state action." *Hadges I*, 733 F.Supp. at 691 nn. 9–10.

In 1992, Hadges commenced another suit against YRC, this time in New York state court. He alleged several causes of action including that all the harness tracks in New York State were engaged in a civil conspiracy and that the racetracks had blackballed him in violation of the Donnelly Act, New York's antitrust law, N.Y.Gen.Bus.Law § 340 (McKinney). The state court ruled against Hadges on all of his claims. *Hadges v. Yonkers Racing Corp., Westchester Co.*, Sup.Ct., Index No. 2407/92 (Dec. 4, 1992), aff'd, 206 A.D.2d 405, 616 N.Y.S.2d 189 (2d Dep't 1994) (the state court action).

In 1993, Hadges brought another § 1983 action, this time against the Meadowlands Raceway, in federal district court in New Jersey. *Hadges v. New Jersey Sports & Exposition Auth.*, 93 Civ. 673 (D.N.J.1993) (the Meadowlands suit). He alleged that in 1992 Meadowlands had improperly banned him from racing without a hearing. Because Meadowlands is run by a state agency, the New Jersey Sports & Exposition Authority (Sports Authority), there was no dispute as to whether the banning constituted state action. The parties settled that litigation.

In the course of that action, Meadowlands General Manager Bruce Garland submitted an affidavit stating that Meadowlands had banned Hadges based on the YRC ban. In particular, Garland said that Meadowlands had acted pursuant to a Sports Authority resolution adopted in 1992, which provided that Meadowlands would exclude those who had been "ruled off from ... [an]other racetrack." Thus, he stated, "the fact that plaintiff has been barred at Yonkers Raceway would operate as a basis for ... rejecting plaintiff's application for participation in [a] 1993 ... [m]eet at the Meadowlands, had such an application been properly filed."

After successfully settling the Meadowlands suit, and with the appeal from dismissal of the New York state court action pending, Hadges brought the instant Rule 60(b) action in the Southern District of New York. He sought to vacate the court's decision in *Hadges I* on the ground that YRC had perpetrated a fraud on the court in that action by submitting the Galterio affidavit stating that Hadges could continue to work at other tracks despite the YRC ban. Hadges did not inform the district court of the then-pending state court appeal. As noted above, the district court ruled against Hadges and granted YRC's motion for summary judgment. In response to a request by YRC,

the court also imposed sanctions under Fed. R.Civ.P. 11 on both Hadges and Kunstler.

## B. Facts underlying Rule 11 sanctions

In support of his claim for relief in the Rule 60(b) action, Hadges submitted a sworn statement that 1993 was his "fifth year ... out of work, with the boycott by Yonkers still in effect." In addition, he stated that "there was a secret agreement among all of the racetracks, that barring a licensee from one, will result in his being barred from all." Plaintiff's memorandum of law, signed by Kunstler, also asserted that Hadges "has not worked for more than four years." Hadges claimed that he had applied to race at other tracks in New York State, but that these tracks refused to act upon the applications, thereby barring him from racing. He also asserted that upon the advice of a former attorney, Joseph A. Faraldo, he had written to the general managers of these tracks to apply for driving privileges in mid–1990 but received no reply. Hadges presented the court with an affidavit of Faraldo stating that Faraldo had so advised Hadges.

In response, YRC produced documents revealing that Hadges had in fact raced at Monticello Raceway five times in 1991 and seven times in 1993. The most recent race took place less than one month before Hadges submitted his affidavit stating that he had been banned from racing by all tracks in New York State for more than four years. YRC also submitted letters of current and former Racing Secretaries from race tracks in Saratoga, Batavia Downs, Fairmount Park, Vernon Downs and Buffalo who asserted that Hadges had not applied (or they had no recollection of his having applied) for racing privileges at their respective tracks in the relevant time period.

In a memorandum of law and notice of motion to dismiss the Rule 60(b) action, YRC requested that the court impose sanctions on Hadges and, if warranted, on his counsel for this misrepresentation and for failing to disclose the state court action to the district court. This method of requesting Rule 11 sanctions was, as set forth below, contrary to the procedural requirements of Rule 11 that took effect on December 1, 1993, five days

before Hadges filed his complaint in the Rule 60(b) action and 15 days before YRC requested sanctions.

After YRC requested sanctions, Hadges submitted an affidavit dated December 28, 1993, admitting that he had raced in Monticello in 1991 and 1993, but explaining that he considered the races insignificant because he had earned less than $100 in the two years combined. That affidavit also described a so-called "scratching incident" that Hadges claimed had taken place at Yonkers Raceway on October 31, 1989. He stated that although his state racing license had been restored in 1989, New York State Racing Board judges "scratched" him from that race, in which he was to have ridden the horse "Me Gotta Bret." After this scratching incident, YRC informed him of its independent ban. Hadges argued to the district court that this sequence of events supported his theory that YRC was acting as a state agent in banning him and thus could be held liable in a § 1983 action. Hadges submitted to the court a "scratch sheet," purporting to document his version of the event.

YRC then submitted what the district court later described as "overwhelming proof" that the scratch sheet did not refer to an October 1989 race, but rather to a November 1987 race.

In its decision on the merits of the Rule 60(b) action, the district court found that Hadges had raced at Monticello in 1991 and 1993 but that he had made only a "minimal" amount of money. 845 F.Supp. at 1041. It also found that the legal basis for Hadges's Rule 60(b) action was not "so frivolous as to warrant Rule 11 sanctions." Id. However, the court was "quite concerned" that Hadges and Kunstler had attempted "to indicate that [Hadges] had not raced in four years when, in fact, he had privileges at Monticello in both 1991 and 1993." Id. The court stated that Hadges had "made matters worse by attempting to strengthen his claim of state involvement alleging that he was scratched from driving Me Gotta Bret on October 31, 1989 by the judges of the racing board." Id. The court further found that submission of the undated scratch sheet was a "flagrant misrepresentation ... suggest[ing] the need

for sanctions, certainly against the plaintiff and possibly against his counsel." Id. The judge invited Hadges and Kunstler to submit papers opposing the imposition of sanctions. The court did not refer to the nondisclosure of the state court action as a possible basis for sanctions.[1]

Thereafter, Hadges submitted an affidavit admitting that he had made a misstatement about the scratching incident but expressing his objection to sanctions. He stated that this error was the result of a simple memory loss, and that the scratch sheet involved was bona fide proof of his having been scratched in 1987 rather than in 1989. He went on to describe yet another 1989 incident in which he had been scratched from racing the horse "Dazzling GT" at YRC. Hadges also submitted an affidavit of his then-assistant Erik Schulman, which also described the 1989 Dazzling GT scratching incident. Further, Hadges repeated that he had written to the General Managers (not the Racing Secretaries relied upon by YRC) of the various tracks to request driving privileges but had received no reply. He attached copies of the letters along with copies of postal receipts.

Kunstler also submitted a sworn response, which stated that he "had no idea" that the scratch sheet was from 1987 rather than 1989, and set forth the facts of the Dazzling GT incident. Kunstler maintained that the error regarding the date of the scratch sheet was unintentional but would not have affected the outcome of the case in any event. Regardless of its date, he argued, the scratch sheet was evidence that YRC was acting as an agent of the state Racing Board and could therefore be held liable in a § 1983 action. Thus, he maintained that submission of the document was not sanctionable. Kunstler's

affidavit did not describe the efforts he had undertaken to verify his client's factual claims.[2] YRC then submitted further affidavits stating that it had no records concerning the alleged Dazzling GT incident.

Thereafter, in the second ruling on appeal to us, the judge imposed a Rule 11 sanction of $2,000 on Hadges as an appropriate sanction for his misrepresentations. The judge also censured Kunstler under Rule 11 for failing to make adequate inquiry as to the truth of Hadges's affidavits and for failing to inform the court of the pending state court litigation. In the course of his opinion, the judge stated:

> Mr. Kunstler is apparently one of those attorneys who believes that his sole obligation is to his client and that he has no obligations to the court or to the processes of justice. Unfortunately, he is not alone in this approach to the practice of law, which may be one reason why the legal profession is held in such low esteem by the public at this time.

Kunstler responded in a letter to the court, in which he argued that the court erred in sanctioning his client $2,000 and in censuring him. In particular, he objected to the court's characterization of him as an attorney "who believes that his sole obligation is to his client," and he objected to the court's charge that his approach to law practice was in part responsible for the low public esteem for the legal profession. Kunstler went on to state his opinion that the court's comment was "generated by an animus toward activist practitioners who, like myself, have, over the years, vigorously represented clients wholly disfavored by the establishment."

---

1. In fairness, we note that YRC has also hardly been a model of candor in this litigation. YRC submitted documents to the district court making it appear that Hadges had earned nearly $2,000 at Monticello in 1991 and 1993, when in fact, the record is uncontroverted that as the driver he earned less than $100.

2. Kunstler's affidavit also sought to disqualify Judge Goettel, claiming that the judge had gained knowledge of facts in this case through his involvement in a different litigation. In that prior litigation, according to an affidavit of Hadges's then-attorney, Robert A. Schutzman,

Judge Goettel had ordered the Racing Board to reissue Hadges's license after his suspension was over. On this basis, Hadges sought to have the judge (1) withdraw his decision in the Rule 60(b) action in its entirety, (2) disqualify himself pursuant to 28 U.S.C. § 455 "for personal knowledge of material facts in this case, learned in the course of different litigation," and (3) hold a hearing on the above issues. The court denied all of these requests, and Hadges has not appealed from the judge's decision not to recuse himself on this basis.

The court treated the letter as an application to reargue the sanction issues. Its order denying the application is the third ruling on appeal to us. In that order, the court quoted at length from a recent New York state court opinion criticizing Kunstler's law partner, Ronald L. Kuby in an entirely unrelated case. See *People v. Colin Ferguson,* Nassau County Court, N.Y.L.J. at 25–26 (Apr. 26, 1994). The judge's order further reprimanded Kunstler stating:

> Finally, Mr. Kunstler claims that he is entitled to "consideration" because of his representation of unpopular clients. Undoubtedly an attorney who assumes or is assigned the defense of an unpopular case or client and does so at risk to his practice or standing in the community (such as the fictional attorney Atticus Finch in Harper Lee's "To Kill a Mockingbird") is entitled to some consideration. However, an attorney who aggressively and repeatedly seeks to represent unpopular causes or questionable clients for personal reasons of his own is not deserving of any particular consideration. And an attorney who places himself and his causes above the interests of justice is entitled to none.

This appeal from the judgment for YRC in the Rule 60(b) action and from the two April 1994 rulings on sanctions followed.

## II. Discussion

### A. The Rule 60(b) action

■ Hadges argues that the district court erred in not setting aside, pursuant to Rule 60(b), the judgment in *Hadges I.* He maintains primarily that the Galterio affidavit filed in *Hadges I,* which stated that Hadges could race at other tracks despite the YRC ban, was directly contradicted by the Garland affidavit produced in the Meadowlands suit and constituted a fraud on the district court. Hadges argued that, at the very least, genuine issues of material fact precluded summary judgment in the Rule 60(b) action.

Rule 60(b) establishes a means by which a party may seek relief from a court's judgment or order. Clause (3) of the Rule sets forth as one such ground of relief, "fraud ..., misrepresentation, or other misconduct of an adverse party." This basis of relief is unavailable, however, unless the aggrieved party makes a motion under the Rule within one year of the judgment or order. See Fed. R.Civ.P. 60(b). In this case, appellant sought Rule 60(b) relief more than one year after the March 1990 decision in *Hadges I.*

■ However, in a so-called "savings clause," Rule 60(b) provides that "[t]his rule does not limit the power of a court ... to set aside a judgment for *fraud upon the court."* Id. (emphasis supplied). Pursuant to the savings clause, a party may bring an independent action to vacate a court's ruling. *Gleason v. Jandrucko,* 860 F.2d 556, 558 (2d Cir.1988) (citing advisory committee note). Fraud is the basis for relief under both clause (3) and the savings clause of Rule 60(b). However, "the type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by timely motion." Id. (citing *Hazel–Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 244–46, 64 S.Ct. 997, 1000–01, 88 L.Ed. 1250 (1944)). " '[F]raud upon the court' as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication." *Gleason,* 860 F.2d at 559 (citations omitted); *Transaero, Inc. v. La Fuerza Area Boliviana,* 24 F.3d 457, 460 (2d Cir.1994). The concept of "fraud on the court" embraces "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir.1972) (citation omitted).

Hadges points to two footnotes in the district court's opinion in *Hadges I,* which he says reveal that the earlier judgment was obtained through fraud on the court. In one footnote, which supported the district court's conclusion that the YRC ban did not amount to a de facto license revocation, the court stated that Hadges remained free to race at Meadowlands Raceway. 733 F.Supp. at 691 n. 9. In the other footnote, the district court stated that if Hadges could show concerted

action by racetracks to ban him, he might be able to make out a cause of action under § 1983:

> We admit that proof that other tracks in the state followed YRC's decision could establish state action since YRC's decision, in effect, would result in the de facto revocation of plaintiff's license. In fact, one of the principal reasons behind the conclusion that decisions by the New York Racing Association ("NYRA") are state action is the fact that NYRA, a not-for-profit association operating New York's thoroughbred tracks, can preclude parties from working at virtually all of New York's thoroughbred tracks.

Id. at 691 n. 10.

In denying Hadges relief under Rule 60(b), however, the district court stated that "the availability of the Meadowlands in New Jersey was not an essential aspect of this court's earlier decision." 845 F.Supp. at 1040. The court also found that Meadowlands's temporary ban on Hadges, imposed "several years" after the YRC ban, "was not something reasonably foreseeable to anyone at the time we granted defendant's motion for summary judgment." Id. Thus, the court held that there had been no fraud on the court.

We review this portion of the district court's ruling for abuse of discretion. *Transaero*, 24 F.3d at 459; *Branum v. Clark*, 927 F.2d 698, 704 (2d Cir.1991). We hold that the district court did not abuse its discretion in denying Rule 60(b) relief. First, Hadges was not banned at Meadowlands until 1992, several years after YRC initiated its ban and after completion of the *Hadges I* litigation. Meadowlands did not even adopt the resolution pursuant to which it suspended Hadges until 1992. In addition, Galterio has consistently denied that he knew any facts that would contradict the truth of his statement. Hadges has failed to produce persuasive evidence to suggest otherwise. Given these facts, it is difficult to see how Galterio's affidavit could constitute any kind of fraud.

Further, YRC and the Meadowlands are not joined at the hip. The fact that a state-run facility in New Jersey might deem it extremely persuasive that a private facility in New York had banned Hadges does not mean that the two facilities conspired to ban him. Nor does it show that all the racetracks in New York State engaged in concerted action to blackball Hadges. Although we agree with the district court that the Rule 60(b) action was not frivolous, the alleged fraud here simply does not come close to seriously affecting the integrity of the normal process of adjudication, and is not grounds for Rule 60(b) relief.

Hadges also argues that the district court erred in denying Rule 60(b) relief because it based its decision in part, alluding to the state court action, on res judicata and abstention. He claims that these were inappropriate grounds because the state court action did not result in a decision on the merits. We agree with Hadges that the state court decision was not a decision on the merits, although we understand that arguably it could be viewed as such. In any event, these grounds were not necessary to support the judgment denying Rule 60(b) relief. Since we believe that the district court was correct in concluding that there was no fraud on the court, its denial of Rule 60(b) relief must be upheld.

### B. Rule 11 sanctions

As we have already noted, not only did the district court rule against Hadges regarding his claims of fraud on the court in *Hadges I*, but it went on to impose Rule 11 sanctions on both Hadges and Kunstler for their own misrepresentations and omissions. This determination was based on two principal grounds: (1) misstatement of the date of the alleged "scratching" incident and (2) misstatement regarding Hadges's lack of work in the years since the YRC ban. In addition, the court based Kunstler's censure on his failure to inform the court of the state court action. The court also found that Hadges's sanction was justified in part by the disqualification motion, referred to in note 2 above, which the court characterized as "bizarre." Hadges and Kunstler argue that the district court abused its discretion in imposing the Rule 11 sanctions.

As noted above, an amended version of Fed.R.Civ.P. 11 came into effect on Decem-

ber 1, 1993, five days before Hadges filed his complaint in the Rule 60(b) action in the district court. Rule 11 provides in relevant part:

(b) Representations to Court. By presenting to the court ... a pleading, written motion, or other paper, a[ person] ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

\* \* \* \* \* \*

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

\* \* \* \* \* \*

(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

\* \* \* \* \* \*

(B) On Court's Initiative. On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

(2) Nature of Sanction; Limitations. A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

(B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

(3) Order. When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

\* \* \* \* \* \*

Fed.R.Civ.P. 11.

The 1993 amendment to Rule 11 is "intended to remedy problems that ha[d] arisen" under the 1983 version of the Rule and is expected to "reduce the number of motions for sanctions presented to the court." Advisory committee note on 1993 amendment. The new Rule liberalizes the standard for compliance and provides procedural safeguards to enable parties to avoid sanctions. See 2A Moore's Federal Practice ¶ 11.02[1] at 11–23 (2d ed. 1994). Of particular relevance here, the 1993 amendment establishes a "safe harbor" of 21 days during which factual or legal contentions may be with-

drawn or appropriately corrected in order to avoid sanction. Fed.R.Civ.P. 11(c)(1)(A). In addition, litigants must move for sanctions "separately from other motions or requests." *Id.* The Rule also provides that "monetary sanctions may not be awarded against a represented party" for frivolous legal arguments advanced by the party's attorney. Fed. R.Civ.P. 11(c)(2)(A). The standard for sanctioning factual contentions is also revised. Under the former Rule, a signature on a document certified that the contentions therein were "well grounded in fact." Under the current Rule, the "certification is that there is (or likely will be) 'evidentiary support' for the allegation." Advisory committee note on 1993 amendment.

### 1. Hadges's sanction

■ Hadges argues that the district court abused its discretion in imposing sanctions on him. YRC argues that the sanctions were justified. We believe that Hadges is correct.

In imposing sanctions, the district court apparently did not take into account YRC's failure to comply with the revised procedural requirements of Rule 11. In this case, YRC did not submit the sanction request separately from all other requests, and there is no evidence in the record indicating that YRC served Hadges with the request for sanctions 21 days before presenting it to the court. Thus, YRC denied Hadges the "safe-harbor" period that the current version of the Rule specifically mandates. See advisory committee note to 1993 amendment; see also *Thomas v. Treasury Management Ass'n*, 158 F.R.D. 364, 368–69 (D.Md.1994); *Collins v. Morsillo*, 94–CV–884, 1994 WL 542204 at *3 (N.D.N.Y. Sept. 19, 1994); *Furman & Halpern, P.C. v. Nexgen Software Corp.*, 93–CV–2788, 1994 WL 287795 at *7–8 (E.D.Pa. June 28, 1994); *In re VMS Sec. Litig.*, 156 F.R.D. 635, 641 (N.D.Ill.1994).

If Hadges had received the benefit of the safe-harbor period, the record indicates that he would have "withdrawn or appropriately corrected" his misstatements, thus avoiding sanctions altogether. Hadges did in fact cor-

rect one of his misstatements by admitting in an affidavit, sworn to on December 28, 1993, just 12 days after YRC asked for sanctions, that he had raced at Monticello in 1991 and 1993.[3] Thus, this misstatement is not sanctionable.

Hadges also explained and corrected his misstatement about the 1989 date of the first scratching incident and described another scratching incident in 1989 involving another horse (Dazzling GT). This correction was supported by his own affidavit sworn to on March 17, 1994, and the affidavit of Erik Schulman, sworn to on March 16, 1994. Both were filed with the district court on March 21, 1994, just one week after the court issued its order stating that it was considering imposition of sanctions. Apparently, YRC had not previously requested sanctions on the basis of the scratching incident. Although YRC subsequently questioned whether the Dazzling GT incident described by Hadges and Schulman had taken place, the district court did not rely on this as a basis for imposing sanctions. We note that Kunstler also filed an affidavit making similar retractions.

■ In addition to sanctioning Hadges for his factual misrepresentations, the district court ruled that sanctions were justified in part by the disqualification motion filed on Hadges's behalf. See note 2 above. In relying on the latter ground, the court imposed monetary sanctions on a represented party for making a legal contention that the court believed was not warranted by existing law or by a nonfrivolous argument for a change in existing law. Revised Rule 11 specifically prohibits imposition of monetary sanctions on the party on this basis. Fed.R.Civ.P. 11(b)(2) & 11(c)(2)(A).

Rule 11 also provides that a court may impose sanctions on its own initiative. Fed. R.Civ.P. 11(c)(1)(B). If a court wishes to exercise its discretion to impose sanctions sua sponte, it must "enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney,

**3.** The document is stamped as filed with the district court on March 14, 1993. Apparently the stamp was set to the wrong year. The record does not reveal why the document was not filed until March. The court issued its sanctions order on March 14, 1994.

law firm, or party to show cause why it has not violated subdivision (b) with respect thereto." Id. In this case, the court indicated that it was imposing sanctions in response to YRC's request and did not state that it was imposing sanctions on Hadges sua sponte. We doubt that sua sponte sanctions would have been justified here. The advisory committee note on the 1993 amendment specifically states that such sanctions "will ordinarily be [imposed] only in situations that are akin to a contempt of court." Hadges's conduct did not rise to that level.

Thus, under all the circumstances, particularly the failure to afford Hadges the 21–day safe-harbor period provided by revised Rule 11, we believe that the sanction of Hadges should be reversed.

### 2. Kunstler's censure

 Like Hadges, Kunstler did not receive the benefit of the safe-harbor period. The district court imposed sanctions on Kunstler for failing to adequately investigate the truth of Hadges's representations prior to submitting them to the court and for failing to disclose that Hadges had brought an action against YRC in New York state court. Kunstler argues that the court's censure of him was an abuse of discretion because the court was motivated by a personal or political animus against him and because his conduct was not sufficiently egregious to justify imposition of sanctions.

In our decisions concerning the former version of Rule 11 we have had occasion to address the reasonableness of an attorney's reliance on information provided by a client. In *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006 (2d Cir.1986), the plaintiff brought suit against her employer and supervisors under the Rehabilitation Act of 1973 and state law. Employers are not liable under the Rehabilitation Act unless they receive "[f]ederal financial assistance." 29 U.S.C. § 794. The employer sent letters to the plaintiff's attorney asserting that it did not receive federal financial assistance, but her attorney persisted in prosecuting the Rehabilitation Act suit. The district court agreed with the employer and dismissed the claims. Although plaintiff's attorney had submitted an affirmation stating that his client had advised him that the employer received federal grants, the district court imposed sanctions. We found that the district court abused its discretion because the attorney's reliance on his client's statements was reasonable. *Kamen,* 791 F.2d at 1007–12.

A few years later, we relied on *Kamen* in holding that "[a]n attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable." *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1470 (2d Cir. 1988), rev'd in part on other grounds sub nom. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). This interpretation is in keeping with the advisory committee notes on former Rule 11, which indicates that the reasonableness of an inquiry depends upon the surrounding circumstances, including

> such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading . . .; or whether he depended on forwarding counsel or another member of the bar.

Advisory committee note on 1983 amendment to Fed.R.Civ.P. 11.

In *Calloway,* at least one of the plaintiff's claims "was never supported by any evidence at any stage of the proceeding," and we affirmed the district court's imposition of sanctions. *Calloway,* 854 F.2d at 1470 & 1473. However, we went on to set forth a procedure for district courts to follow in analyzing whether an attorney has conducted a reasonable inquiry into the facts underlying a party's position.

> In considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings or at trial. Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary.

Id. at 1470.

The new version of Rule 11 makes it even clearer that an attorney is entitled to rely on the objectively reasonable representations of

the client. No longer are attorneys required to certify that their representations are "well grounded in fact." Fed.R.Civ.P. 11 (1983) amended 1993. The current version of the Rule requires only that an attorney conduct "an inquiry reasonable under the circumstances" into whether "factual contentions have evidentiary support." Fed.R.Civ.P. 11(b) & (b)(3). Thus, the new version of Rule 11 is in keeping with the emphasis in *Calloway* on looking to the record before imposing sanctions.

In its first sanction decision in April 1994, the district court here stated:

> With respect to plaintiff's counsel, William M. Kunstler, the situation is not quite as clear. There is nothing to indicate that, on the serious factual misrepresentations made in plaintiff's papers, Mr. Kunstler had independent knowledge of their falsity. However, it is equally clear that he made no attempt to verify the truth of the plaintiff's representations prior to submitting them to the court.

Apparently, the district court did not focus, as Rule 11 now requires, on whether the pretrial proceedings provided "evidentiary support" for the factual misrepresentations with which the court was concerned.

It is clear that the record before the district court contained evidentiary support for Kunstler's incorrect statements. As to the scratching incident, the record included a sworn statement by Hadges describing an October 1989 incident in which he claimed to have been scratched from driving the horse "Me Gotta Bret." A scratch sheet, which did not reveal the year in which it was made out, was also part of the record. Kunstler later submitted an affidavit admitting the error and stating that he had no idea that the 1989 date was wrong. He further maintained that regardless of its date, the scratch sheet was relevant to show collaboration between the Racing Board and YRC in 1987, which would subject the latter to § 1983 liability. Moreover, it appears to be undisputed that most of the evidence YRC produced to persuade the court that the event had taken place in 1987 was within its possession, not Hadges's. See *Kamen,* 791 F.2d at 1012 (noting reasonableness of relying on client representations

where "the relevant information [is] largely in the control of the defendants").

We also believe that the record contained evidentiary support for the claim that Hadges had not worked for four years. At the time the district court granted YRC summary judgment in Hadges's Rule 60(b) action, it had before it Hadges's affidavit asserting that he had written to racetrack General Managers asking for driving privileges and had not received any replies. The record also contained attorney Faraldo's affidavit asserting that Hadges had followed his advice in writing these letters. Moreover, Kunstler represented Hadges in the Meadowlands suit in which Meadowlands admitted banning Hadges based upon the YRC ban. We believe that in light of his familiarity with the Meadowlands litigation and the sworn statements of his client and another attorney, Kunstler had sufficient evidence to support a belief that Hadges had not participated in harness horseracing in New York since the YRC ban. Cf. *Oliveri v. Thompson,* 803 F.2d 1265, 1279 (2d Cir.1986) (noting relevance of attorney familiarity with similar litigation in satisfying inquiry requirement), cert. denied sub nom. *Suffolk County v. Graseck,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); Fed.R.Civ.P. 11 (1983), advisory committee note on 1983 amendment (reasonableness of inquiry depends upon "such factors as ... whether [the attorney] had to rely on a client for information as to the facts underlying the pleading ...; or whether [the attorney] depended on forwarding counsel or another member of the bar.").

■ The district court also believed that censure of Kunstler was justified because "he had to be aware of the recent state court litigation, still on appeal, but made no mention of it in his initial papers." Kunstler concedes that he was aware of this litigation but maintains that he did not believe that it was necessary to bring the proceedings to the court's attention because the New York Supreme Court had not ruled on the merits of the state law blackballing claim. As noted above, we agree with the view that the state court opinion was not a decision on the merits of that issue. Even if it were, there would be no tactical advantage in not men-

tioning the state court ruling to the district court since YRC was a party to both actions (indeed, it was represented by the same law firm and the same attorney in both actions) and could be expected to inform the district court of the state court action if it were helpful.

Moreover, the portion of the court's opinion in the Rule 60(b) action that listed the possible bases for imposition of sanctions omitted any reference to Kunstler's nondisclosure of the state court action. Rule 11 specifically requires that those facing sanctions receive adequate notice and the opportunity to respond. See Fed.R.Civ.P. 11(c)(1)(A) & (B). Although YRC had requested sanctions on this ground, as discussed above, that request was procedurally improper. Thus, although Kunstler would have been wiser to alert the court to the state court proceedings, the nondisclosure was not a proper ground for sanctioning him.

YRC maintains that sanctions were justified because the motions to reargue and to disqualify the district court judge were frivolous. As noted above, the court referred to the disqualification motion as a reason for sanctioning Hadges. However, the court did not rely upon it as a ground for the censure of Kunstler, and we decline to do so here.

Finally, the remarks of the district court, which we have quoted in substantial part above, contribute to our conclusion that the sanction of Kunstler was unjustified. These remarks have the appearance of a personal attack against Kunstler, and perhaps more broadly, against activist attorneys who represent unpopular clients or causes. We find the court's criticism of Kunstler's law partner, Ronald L. Kuby, for his activities in *another* case, especially unwarranted. For all these reasons, we reverse the imposition of the sanction of censure on Kunstler.

### III. Conclusion

We have considered all of the parties' remaining arguments and find that they are without merit.

We affirm the ruling of the district court denying Rule 60(b) relief. We reverse the

Rule 11 sanction of Hadges and the censure of Kunstler.